Hunt, J.,
delivered ihe opinion of the court:
The claimant was a dealer in flour and other merchandise in Santa Fé, N. Mex., in 1868 and 1869. One Abraham Gold, his grand nephew, was then a clerk in the same town, and entered into a contract with the military officers of the government to supply .the garrison at Fort Wingate with flour for twelve months from the 21st September, 1868, or for such less time as the Commissary-General of Subsistence might direct, and when required by. the commissary of subsistence. Soon after making this contract the claimant undertook to discharge its obligations, and for that purpose a writing was executed between him and Gold by which the latter transferred to the claimant all his interest in the contract.
The claimant delivered the flour stipulated for in the contract, and, under a power of attorney from Gold, received pay for the quantities so delivered. He brings this suit to recover the price of two parcels of flour, which he alleges were delivered by him in his own behalf.
The first parcel for which he claims judgment is found by the court to have been paid for to him. The only controversy to be disposed of refers to the second parcel, which consisted of 12,383 pounds. This has not been paid for, although the flour was received and consumed by the government.
*391 The findings show that tbe flour was started from Santa Fé to be delivered at Fort Wingate to tbe officers of tbe garrison; but before it reached there tbe claimant sent orders, which overtook tbe wagons transporting it, and directed that it be not delivered to tbe government officers, but to one Provencher, bis agent at Fort Wingate. After this, and while tbe wagons were yet on their way, an officer of tbe garrison, with an escort of soldiers, stopped tbe wagons and took from them a number of sacks of flour, with which be drove oft to Fort Wingate. This was done against tbe objections of tbe carriers. Tbe officer disregarded their objections, said there was no flour at tbe garrison, and that be must have that without regard to its ownership. Tbe wagons with tbe remainder of tbe flour kept on to Fort Wingate, and proceeded to tbe store of Provencher. They were there ordered by an officer, attended by a party of soldiers, to tbe commissary storehouse, where tbe flour was unladen and stored against tbe protest of Provencher and tbe carriers. It was in time consumed by tbe troops, and never has been paid for to tbe claimant.
An implied promise is created by law as well as by natural justice that tbe owner of property shall receive its value from a party who may have appropriated it to bis us'e and benefit. This is as much tbe case where tbe government enjoys tbe property as in tbe instance of a private individual. (Mason v. The United States, 14 C. Cls. R., 70.)
Several objections are urged against tbe claimant’s demand which call for notice. It is contended that tbe claimant is tbe transferee of Gold, and bad such an interest in tbe contract of tbe latter as is prohibited under § 3737, Eevised Statutes. It is an answer to this objection to say that tbe claimant does not bring bis action upon tbe contract, and makes no claim under it. (14 C. Cls. R., ib.) It is tbe defendants who set up tbe written contract and seek to bind tbe claimant within its folds.
But, conceding that tbe claimant came under tbe liabilities of tbe contract with Gold, we find that be was not put in default for a failure to deliver tbe flour according to its tenor. It was only after tbe appropriation of this flour that a demand is proved to have been made upon him or Gold to furnish flour; and it is not shown that tbe government sustained any specific loss from tbe failure of Gold or tbe claimant to comply with tbe contract.
*392 The claimant had the undoubted right to dispose of his goods as he chose. No one could properly interfere with that right except by authority of law. Even if the claimant had originally intended to deliver this flour under the contract, and had started it forward for that purpose, he could change his mind and its destination at any moment before it was reduced to possession by the agents of the government.
Whether the change of the destination of the flour was effected by the claimant in the hope that his agent might take advantage of the necessities of the garrison and so secure a higher price than that stipulated in the contract, or from any other sinister motive, it is unnecessary to inquire. There is> much cogency and plausibility in the argument of the learned counsel for the defendants that the claimant and his nephew, Gold, were in substance one and the same person, and had confederated and conspired together in order to speculate with impunity upon the government by fraudulently evading the obligations of the contract.
There is some reason for suspecting that the claimant has, perhaps, walked in the border-land of fraud and followed its crooked paths, where the footsteps of honest suitors ought not to stray. Whilst the evidence fails to make this legally certain, still there is enough in the record to warrant us in awarding him' only the market value of his goods at the place and time the government took possession of them.
The claimant is entitled to recover the price of 12,383 pounds of flour, at 8;{: cents per pound, viz, $1,021.60.