Scoeield, J.,
delivered the opinion of the court:
This claim is founded upon an alleged implied contract on the part of the defendants for use and occupation of land.
The first question is, was there an implied contract which can be enforced in this court?
In 1858 the United States forces established a military post called Fort Quitman on a certain unoccupied tract of land in Texas, and so occupied it until May 1, 1861, at which time the rebellion broke out. During this period of occupancy the legal title to the land was in the State of Texas. The occupation was for the special protection of that State against raids from Mexico, and so far as appears without objection on the part of the State.
*92 May 10, 1861, Texas conveyed the land to A. C. Hyde.
January 1,1868, the United States forces again came to occupy Fort Quitman and continued the occupancy until January, 1877. It does not appear that any objection to this occupancy was made by the owners of the land, but they were persistent in claiming the rent.
At that time there was some doubt as to the party entitled to contract for and receive rent. Some parties claimed title under the Cassillas warrant and some under the Owen warrant. (Findings I and II.) Several undivided interests had also been created and the title was very much mixed and confused. While there may have been some understanding that a proper rent would be paid, owing, perhaps, to the uncertainty of ownership no written lease was at first made.
May 28, 1869, the Secretary of War requested the opinion of the Attorney-General “as to the legal rights of the several, parties in the premises.”
October 19, 1870, about a year and a half afterwards, the Attorney-General gave the opinion presented in finding IY.
Following this opinion no action was taken and no declaration made asserting title or looking to the acquisition of title on the part of the defendants. On the contrary, on December 31, 1873, six vouchers, covering the rent from January 1, 1868, to June 30, 1873, were made out by S. B. Holabird, deputy quartermaster-general, stationed at the fort, in favor of A. 0.1 Hyde, who claimed title under both the Cassillas and ©wen warrants, and B. S. Dowell, administrator of Jarvis Hubbell, who claimed under the Owen warrant only. The vouchers were made out and forwarded under instructions from the Quartermaster-General. On the same day a lease for future rent with the same parties was drawn up, signed, and forwarded to the Quartermaster-General. The vouchers and lease were approved by General Augur, then commanding in the Department of Texas.
June 22, 1871, the Secretary of War gave a written order to the Quartermaster-General that in case a certain statement made by Mr. Welles, the attorney, was found to be correct, to send “the vouchers to the Treasury for settlement.” He further orders that “the claim prior to the war can remain for future adjustment.” (Finding Y.) The statement of Mr. Welles was found to be correct, and under this peremptory order of *93 the Secretary the vouchers were sent to the Third Auditor by the Quartermaster-General, but the latter officer made no recommendation as to what action the Auditor should take. He gives as a reason for his non-action that “the Attorney-General £ suggests that no acknowledgment thereof [the claimant’s title] be made, by lease or otherwise, without a judicial determination in its favor,’” and that “the chief quartermaster, Department of Texas, reported April 1, 1874, that there had been no decision of any court in this matter.” (Findings IY and Y.)
Thereafter Anson Mills, one of the claimants, finding that the Quartermaster-General, under the advice of the Attorney-General, would not recommend the payment of rent until their conflicting claims of title had been submitted to judicial determination, summoned by bill in equity all the parties claiming title, to submit their respective claims to the decision of the circuit court of the United States. July 6,1874, that court, in accordance with the laws of Texas, decreed that the title to the premises “ be divested out of the defendants for the purpose of adjusting all the equities between the parties, and the same be vested in Joseph S. Lockwood as trustee * * * who, shall have full power to dispose of said property by sale or lease, and to collect the back and future rents,” &o.
After this decree a second lease, dated July 1, 1875, was made by G. H. Tompkins, deputy quartermaster-general, stationed at the fort, with said Lockwood as trustee. (Finding YII.)
July 1, 1876, this lease was renewed by the same parties, except that A. I. Perry was the deputy quartermaster-general. The rent agreed upon was $300 a year. These two leases were approved by Generals Ord and Sheridan and forwarded to the Quartermaster-General, but he took no action upon them.
April 30,1880, the claims were transmitted to this court by the Secretary of War.
There is no intimation in the action, correspondence, or declarations of any officer under whom possession was taken or continued of any purpose or desire to acquire title for the United States. Youchers were made out for the payment of rent covering a period of five or six years. Three leases promising to pay rent were made for as many different years. These vouchers and leases were approved by Generals Augur, Ord, *94 and Sheridan. To he sure, these leases were not binding upon the United States until approved by the Quartermaster-General, but they serve to negative the pretension that the property might have been taken or held under a claim of title. Neither did the Secretary of War nor the Quartermaster-General set up a claim of title. The delay and hesitancy in the department seems to have been caused by the difficulty in determining who were the proper parties to receive the rent.
The Langford Case (101 U. S. R., 341) cited by the defendants, carefully read, supports rather than invalidates this claim. Justice Miller says, “The United States always asserted that their possession was by virtue of their own title, which was hostile to that of the claimant.” Upon this fact, thus sharply stated, the case was ruled. It may well be inferred that if no title had been claimed by the government a promise to pay would have been implied.
In the case before us the owners never objected to the occupancy, and the immediate occupants never claimed title. The one claimed rent; the other agreed, so far as they were able, that it should be paid. The Secretary of War, who had the power to contract, ordered the rent vouchers to be sent to the Treasury for settlement. That he intended this order as an approval and adjudication in favor of the vouchers is clear from the fact that in the same order he directed that the claim for rent before the war should be held for future adjustment.
If these facts constitute neither an express nor an implied contract it is not easy to imagine a state of facts that avoiding the one would constitute the other.
In the case of the United States v. Russell (13 Wall. R., 623), where three steamboats belonging to private parties were forcibly taken into government service by Army officers, the Supreme Court held that a promise on the part of the United States to pay a reasonable compensation was implied, and of that implied promise this court had jurisdiction.
That case, it is said, was justified by a great emergency of war. Certainly it was so justified; that is to say, the taking of private property for public use without present compensation was justified or excused by the emergency. Taking property without such emergency is less excusable, but the obligation under the Constitution to make just compensation in the future is as strong in the one case as in the other. In the one *95 case the property is taken from necessity, in the other from convenience. The Constitution alike in each case enjoins just compensation, and for remedy sanctions no arbitrary or illogical distinction.
Upon that subject it has heretofore been said by this court that “the principles of law, as well as the dictates of natural justice, raise an implied promise in such cases to compensate the owner for the use of his property, which the defendants have thus had the benefits of. It would be so in like transactions between individuals, * * * and it is no less so when the United States are parties, since the Constitution has guaranteed to all that private property shall not be taken for public use without just compensation.” (Mason v. The United States, 14 C. Cls. R., 70, cited with approval in Herch v. The United States, 15 C. Cls. R., 391. See also the cases of Langford and Russsll, before referred to.)
In the case before us, however, the conclusion of the court is not dependent upon this provision of the Constitution, but is based upon the principles of the common law, whereby a contract to pay for use and occupation is implied, in cases where the owners consent, by implication or agreement, to the use and occupation and the occupants do not claim adversely.
But it is said that the correspondence between the Secretary of War and the Attorney-General, and the indorsement of the Quartermaster-General upon the lease and vouchers sent to the Third Auditor (Findings IY and Y), are evidence of a claim of title. We do not so understand them. No claim of title had then been made by any Army officer. None had been suggested in the War Department. There was apparently no objection to paying rent, but the question was as to whom it should be paid. The Secretary inquired, of the Attorney-General. After considering the question a year and a half he replied in substance that if the United States had selected this land with a view of acquiring title they might still have a claim to it, and he recommended “ that if it is desired to retain possession of the site as a permanent military post measures be at once taken to have the same surveyed, and to procure a patent therefor from the State authorities.” He also advised “that no acknowledgment thereof (the claimant’s title) be made without a judicial determination in its favor.”
*96 The Quartermaster-General followed the last item of advice, but nobody acted on the first. The vouchers were sent to the Third Auditor “ without recommendation,” but no measures were taken to have a survey and procure a patent. In fact such an undertaking was prohibited by law. ' (Rev. Stat., 3736.)
The opinion of the Attorney-General is based upon a hypothetical case. If the government selected it with a view of acquiring title and making a permament fort, such selection might constitute the first step in the acquisition, and it might now be followed up by taking immediate measures to perfect an inchoate title. But there is nothing in the findings to show that it was selected with a view of acquiring title. From all the facts in the case, it appears that the defendants occupied the premises with the consent of the owners and without any claim of title or purpose'to acquire one.
When the Secretary of War ordered the six vouchers which had been made by the deputy quartermaster-general stationed at the fort to be “ sent to the Treasury for settlement ” (Finding Y) he distinctly recognized the outstanding title and the liability of the defendants to pay rent at the rate of $300 a year. It amounted to an approval of the vouchers and indirectly of the lease. The Quartermaster-General gave them a quasi approval when he instructed the deputy to make them out and forward them for settlement. There appears to have been no claim of title outside of the Attorney-General’s hypothetical case.
Second. Have we a party on record who, according to the forms of procedure in this court, is entitled to recover ?
By the decree in equity, rendered with the consent of all the claimants, the title to the premises was “divested out” of all the parties to the suit and vested in Joseph S. Lockwood as trustee. He was also authorized by the decree to collect the past and future rents. If the decree is valid — and its validity has not been questioned in the argument — Lockwood is the only party entitled’to demand the rent. He does not fall under the prohibition of section 3737 of the Revised Statutes. The decree under which he was appointed is analogous to a decree in bankruptcy under which the assignee takes the place of the original holder. (Erwin’s Case, 97 U. S. R., 392.) In the opin *97 ion of the court, Lockwood is authorized by the decree to sue for the rent in his own name as trustee.
But it is said the claim of Lockwood was not transmitted to the court by the Secretary of War. . That is a mistake. In point of fact it was transmitted. (Finding XI.)
The decree in equity, the notice of his appointment, the two. leases made with him by the deputy quartermaster-general, and his demand of the rent, were all transmitted.
But it is further said that in the letter of transmission the Secretary calls it the claim of Anson Mills. So, indeed, he does, and with great propriety. Before the decree in equity there were four parties claiming rent, Anson Mills being one. By the decree these claims were merged in the trust of Lockwood. The several claimants in the department thereby ceased to hold the legal title, but were still equitable owners under the trustee. ■ Subsequently Hyde, Maverick, and Dowell sold out, assigned, and conveyed all their rights and claims under the decree tc Mills. Thus Mills became the sole owner of the equitable estate under the decree. Thereafter he was known at the department as the only party in interest, though claiming in the name of the trustee. So when the case was sent to this court it was entitled the claim of Auson Mills. The departments do not always observe the forms and technicalities of the courts, nor is it necessary that they should. There was but one matter of claim, one item of account, to wit, the rent of Fort Quitman, and but one person really entitled to the rent, though it had been asked for in whole or iu part by Mills, Hyde, Maverick, Dowell, and Lockwood. The claims were so connected that one could not be transmitted without the others. They were all, in fact, transmitted, and all the parties have filed petitions setting forth their original claims, but for the use of Anson Mills.
The objection is entirely technical and should not stand in the way of an honest claim, by divers shifts too long withheld.
It only remains to determine what amount should be recovered.
The title of the several claimants was acquired May 10,1861. Prior to that time the title was in the State of Texas. The subsequent occupancy by the defendants began January 1, 1868, and terminated January 1, 1877. In the leases and vouchers *98 the rent is fixed at $300 a year. The court has found that sum to be a fair compensation.
The court directs that the petition of Mills, Hyde, Dowell, and Maverick be dismissed and judgment be entered in favor of Joseph S. Lockwood, trustee, for the sum of $2,700, for the use of Anson Mills, as requested in said Lockwood’s petition.