GRAi-iam, Judge,
delivered tbe opinion of the court:
The contract in this case was dated the 5th day of August, 1918, and was for the manufacture of Very pistols. These pistols were to be used for giving signals by firing a charge which exploded with certain lighting effects. Delivery was to be commenced on the 1st of September, 1918, and completed on the 1st of March, 1919. The number of pistols to be delivered was 75,000, for which the plaintiff was to receive payment in the sum of $375,000. The contract contained a clause giving the defendant the right to terminate the contract at any time under certain conditions. The armistice having been declared in November, on the 11th of December the defendant, through the Ordnance Department, addressed a communication to the plaintiff stating that “you are requested immediately to suspend further operations under your contract * * * and to order no further materials or facilities,” and further, “to enter into no further subcontracts ” or make any “ further commitments and incur no further expenses,” and stated that the request was made with the view to the negotiation of a supplemental contract providing for cancellation, settlement, and adjustment of the existing contract in a manner that would permit a more prompt settlement and payment than would be practicable under the terms of the existing contract. It concluded by asking for immediate acknowledgment of receipt of the notice and an indication of plaintiff’s decision to comply with or reject the request. On December 14 this letter was forwarded to the plaintiff with a letter from the representative of the Ordnance Department, stating that upon acceptance of the request the negotiation of a settlement in the form of a supplemental contract would be initiated by the St. Louis district claims board, and in this ivay plaintiff would get a more prompt settlement and payment than under the terms of the existing contract.
Replying to these several letters, on the 18th of December the plaintiff acknowledged the notice of “ suspension of the above contract,” stating “ we accept this suspension, effective December 18, 1918, without prejudicing our rights under said contract,” and further, “ we take it from your request that immediate steps will be taken toward the negotiation *215 of a settlement in the formation of a supplemental contract* thereby affording a prompt adjustment, settlement, and payment arising from the suspension and eventual cancellation of the contract, and accept this condition as a consideration of our acceptance of the request of suspension.” On December 27 following, the secretary of the Ordnance Department claims board at St. Louis acknowledged this communication of the plaintiff, saying that it was the wish of the Ordnance Department to do all in its power consistent with the interests of the Government to arrive at a settlement which would enable the plaintiff to take up its regular line of business with the least delay, and to this end inclosed an outline of the method for presenting the claim. The plaintiff was requested to give this careful study and be prepared to act. Further instructions were also given as to preparation of the claim upon printed blanks that would be later furnished.
Pursuant to this correspondence the plaintiff on January 16, 1919, filed an itemized claim in the sum of $189,507.38, in which was a claim for profit of $1.66 each on 30,000 pistols which could have been completed before the termination of the contract but for the delay caused by the Government’s changes in the specifications and drawings. Against this claim the plaintiff entered a credit of $18,211.08 for certain materials, the property of the Government, which had been turned back to the Government, and then sold to and retained by the contractor, leaving a net claim of $171,296.30. Thereafter a partial payment and supplemental contract was entered into. Under this supplemental contract the plaintiff was paid the sum of $103,650.66 as an advance payment, and it was stipulated that the United States agree to pay such additional sum which, together with this last-named sum, would cover such portion of his expenditures, obligations, and liabilities necessarily incurred and for work, labor, and services rendered in connection with the performance of the original contract as would be properly and fairly apportionable to the uncompleted part thereof, enumerating the particular classes of items for which payment was to be made. In this supplemental contract the plaintiff waived all claim to prospective profits which he might have made by the performance of that portion of *216 said original contract which, “under the terms of this supplemental agreement, will not be performed.” It was also provided that in addition to the sums to be paid, as just mentioned, there should be paid such sums as the Secretary of War may deem fair and just to compensate the contractor for expenditures, obligations, and liabilities necessarily incurred, and for work, labor, and services rendered under the original contract or in preparation for the performance thereof or under this supplemental contract. Thereafter, on further hearing, the War Claims Board awarded the plaintiff the additional sum of $14,192.25, which was tendered in full settlement of its claim under the original and supplemental contracts, making a total of $111,842.91 found due under the contract. In arriving at this sum a part of an item of $9,461.72, claimed by the plaintiff as 10 per cent profit on the greater part of the contractor’s claim, as shown by Finding VI, amounting to $3,467.74, was disallowed.
The item of $49,800 claimed as profits by the plaintiff on the pistols which he claimed could have been completed and delivered before the suspension of the contract but for the delay in the work caused by the Government, was disallowed on the ground that it was prospective profits. The contractor refused to accept this proposed final settlement and took an appeal to the War Department Board of Contract Adjustment, which board affirmed the decision of the claims board. It does not appear that any final appeal was taken to the Secretary of War, as provided by the contract.
The plaintiff is here suing apparently, although his claim has assumed different forms and is in different amounts in his petition and proof, for profits which it claims it would have made on pistols that could have been completed and delivered before the suspension of the contract had not the Government delayed the performance of it.
The original contract contained a provision for its termination at the will of the Government, and, except as provided in the clause for termination, is in the same position as a contract made subject to the provisions of the act of June 15, 1917, which the courts have held must be taken to have been read into the contract. See Meyer Scale Co. v. *217 United States, 57 C. Cls. 26, and Bussell Motor Car Co. v. United States, 261 U. S. 514-524. In the last quoted cases it was held that where there was a termination clause there could be no recovery for loss of profits. The right to terminate necessarily contemplates the possibility of not being allowed to complete the contract, with the attendant loss of profits, and the party’s bid includes this risk. It also includes the possibility of a termination before any of the articles contracted for are completed. Thus, the right to recover prospective profits is negatived by the very insertion of á termination clause. Profits are a gain a p'-rty might have made had he been allowed to complete the contract. Until it is completed it can not be known whether there would be a gain or a loss. Profits are a gain which is considered in every contract to balance the risks of a loss. They are only recoverable as a part of the damages claimed for a breach of a contract by preventing its fulfilment according to its terms. Upon proof of a breach of a contract by Its illegal termination and proof that he was ready and willing to perform, the party would be entitled to nominal damages; and if he proceeds further to prove his damage by reason of the breach, and shows that he would have made a profit had he been allowed to carry the contract to completion, he will be allowed a recovery for profits as a part of his damages. United States v. Speed, 8 Wall. 77; Hinckley v. Pittsburgh Steel Co., 121 U. S. 264, 275, 276, and Yates v. United States, 15 C. Cls. 119, 125. If, then, there has been no breach, there can be no recovery of damages or of profits as a part thereof. The defendant had a right under this contract to terminate it at will, so its termination and abrogation did not constitute a breach. The plaintiff’s rights under the original contract, in case of termination, were fixed by the termination clause in the contract. As to this clause, it is only necessary to say that a reading of it will show that it did not contemplate any payment of profits except as they might be allowed us a part of the award of some sum by the'Chief of Ordnance or the Secretary of War in addition to the items of payment therein provided for. As it does not appear that the Chief of Ordnance or *218 the Secretary ever made any such award, it seems unnecessary to discuss the terms of this termination clause further. It also follows that any reservation of rights thereunder by the plaintiff in accepting and agreeing to the request for a cancellation and the making of a supplemental contract does not strengthen .its case as far as its rights under this termination clause are concerned.
The plaintiff suspended work at the request of the Government. It is true that it tried to reserve its rights 'under the original contract, but it nevertheless suspended and entered into negotiations for a settlement, which finally terminated in a supplemental and partial settlement contract under which it accepted payment, as stated, in the sum of $103,650.66. It thus practically put an end to the original contract and all claims under it. It in effect negotiated itself out of its rights under that contract. It accepted part payment under a settlement contract, and is estopped from claiming profits as a part of damages for a breach of the original contract. Having voluntarily terminated the original contract and accepted payment covering in part the outlays and risks under the original contract, it waived its right to any claim for profits thereunder, if it had any. It has no legal standing to sue for damages 'upon the theory of a breach of the original contract while retaining in its possession money paid on the basis of a settlement of it. Upon what theory can prospective profits be allowed to a party to a contract who has voluntarily participated in such a change in the situation of the parties that the contract can not be performed? The plaintiff could have stood upon such-rights as it had under the original contract and demanded a settlement under its provisions and the terms of the termination clause thereof, though, even under this clause, as stated, it could not, have received any payment in the nature of profits unless it had been allowed by the Chief of Ordnance, to whom no appeal was ever made. Its rights, such as it has, were transferred to the Supplemental contract, and are therefore to be determined by the terms of that contract.
If it has a right to recover profits under that contract, the right must be found within its circumference. Under the *219 terms of that contract the contractor waived “ all claim to prospective profits which he might have made by the performance of that part of the original contract which under the terms of this supplemental agreement will not be performed.” If it be said that there is some uncertainty as to the meaning of this language, this uncertainty seems to disappear when the clause is read in connection with the preamble to this contract, in which it is recited that the contractor “is willing to agree to a complete termination of operations under the original contract, and to agree to waive all rights to prospective profits thereunder if he can secure forthwith reimbursements for a portion of the expenditures made and obligations necessarily incurred by him in the performance of the uncompleted portion of the said contract, and provision for the speedy determination and payment of the vario'us items of reimbursement and remuneration herein set forth.” He did receive such reimbursement of the “ expenditures made and obligations necessarily incurred by him ” in the sum of $103,650.66 in cash, and an offer of an additional payment of $14,192.25. These two sums practically covered every item of claim asserted by the contractor in the claim which he presented under the supplemental contract except the? amount claimed for profits. In this view of the case the amount of $14,192.25 offered by the Government in settlement under the supplemental contract, being reasonable in amount and acknowledged by the Government to be due under that contract, should be paid to the contractor. He should be allowed a j'udgment for this amount, and it is so ordered.
The question has been raised in this case as to the application of section 3477 of the Revised Statutes, to the effect that assignments and transfers of any claim from the United States “shall be absolutely null and void unless they are freely made and executed, in the presence of two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof.” The contract out of which the claim in this case arose was in the name of the National Tool & Manufacturing Co., and this company performed such work *220 as was performed before the contract was cancelled. Subsequent to said cancellation the said company changed its name to the Blue Bird Manufacturing Co. The Blue Bird Manufacturing Co. afterwards became insolvent and went into the hands of receivers appointed by the Circuit Court of the city of St. Louis, Mo. Thereafter the Blue Bird Manufacturing Co. and the said receivers therefor entered into a contract with the Davis Sewing Machine Co., of Dayton, Ohio, subject to the approval of the said Circuit Court of the city of St. Louis, for the sale by the said Blue Bird Manufacturing Co. to the said Davis Sewing Machine Co. of all of the Blue Bird Manufacturing Co.’s assets, rights, privileges, and good will, for which payment was to be made to the Blue Bird Co. in certain specified stock of a new Davis Sewing Machine Co., which the said Davis Sewing Machine Co., a corporation of the State of Ohio, was to cause to be incorporated under the laws of the State of Delaware, and to which new company the Davis Sewing Machine Co. of Ohio was to convey a, great part of its assets and all of the assets of the Blue Bird Manufacturing Co. to be acquired by the said Davis Sewing Machine Co. of Ohio under said contract with said receivers and said Blue Bird Manufacturing Co. This contract was approved by the said court, and the receivers were ordered and directed by the court to carry it out. Thereupon the said new company, the Davis Sewing Machine Co. of Delaware, the plaintiff in this suit, was organized and incorporated, and the sale and transfer of the assets of the said Blue Bird Manufacturing Co. were made by said receivers and the said Blue Bird Manufacturing Co. to the Davis Sewing Machine Co. of Ohio, which in turn transferred said assets and a great part of its own assets to the plaintiff in this case, the Davis Sewing Machine Co. of Delaware, in accordance with the provisions of said contract and the order and direction of the court. At the time of said sale and transfer of assets of the Blue Bird Manufacturing Co. to the Davis Sewing Machine Co. of Ohio, and by that company to the Davis Sewing Machine Co. of Delaware, the claim which is the subject matter of this suit was a part of said assets.
*221 The object of section 3477 was to protect the Government, not the claimant, and to prevent frauds on the Treasury. Hobbs v. McLean, 117 U. S. 567. The mischiefs designed to be remedied by act were first, the danger that the rights of the Government might be embarrassed by having to deal with several persons instead of one, and by the introduction of a party who was a stranger to the original transaction; second, by transfer of such claim against the Government to one or more persons not originally interested in it a way might be conveniently opened to such improper influences in prosecuting the claim before the departments, the courts or the Congress, as desperate cases, when the reward is contingent on success, so often suggest. Goodman v. Niblack, 102 U. S. 556, 560. The statute doe.- n<n apply to an assignment by an assignee in bankruptcy. Barke v. United States, 13 C. Cls. 231. A transfer of title to real property by virtue of the decree of a court carrying with it the right to rents accrued is not an assignment in violation of the statute. Mills v. United States, 19 C. Cls. 79. The transfer of a claim of an insolvent corporation against the United States to a receiver is by operation of law and not in violation of the statute. Redfield v. United States, 27 C. Cls. 393. The statute does not apply to claims title to which has been transferred by operation of law. Erwin v. United States, 97 U. S. 392, 397. The statute applies only to voluntary assignments -of demands against the Government. United States v. Gillis, 95 U. S. 407, 416; Price v. Forrest, 173 U. S. 410, 421.
In the instant case this transfer was made by order of the court which had appointed the receivers and having jurisdiction of the subject matter, and by the receivers, the representatives of the court, acting under its order. The claim clearly passed by action of law and the assignment was not in violation of the statute. The plaintiff received its title from the receivers as the result of a judicial proceeding and an order of the court authorizing and directing them so to do.
Hat, Judge; DowNey, Judge; Booth, Judge; and Campbell, Ghief Justice, Concur.