## G. L. CHRISTIAN AND ASSOCIATES
### v.
### The UNITED STATES.
### No. 56–59.

United States Court of Claims.
Jan. 11, 1963.

Norman R. Crozier, Jr., Dallas, Tex., William L. Hillyer, San Diego, Cal., William W. Sweet, Jr., Dallas, Tex., and Chester E. Finn, Dayton, Ohio, for plaintiffs. Richard C. Bexten, Dallas, Tex., was on the briefs.

Carl Eardley, Washington, D. C., with whom was Acting Asst. Atty. Gen., Joseph D. Guilfoyle, for the defendant. Kendall M. Barnes, Washington, D. C., was on the brief.

DAVIS, Judge.[1]

This case, which involves claims totaling $5,156,144.50,[2] grew out of the deactivation of Fort Polk, Louisiana, by the Department of the Army in 1958. At the time when the decision to deactivate Fort Polk was made, a large housing project, which was to consist of 2,000 dwelling units for the use of military personnel at Fort Polk, was being constructed under a contract that had previously been made by the Corps of Engineers pursuant to the provisions of the Capehart Act.[3] The housing contract was terminated by the Corps of Engineers on February 5, 1958, after which numerous claims for damages were submitted to the Government. Most of the claims (from a numerical standpoint) were settled administratively; and the claims asserted in the present litigation remain for disposition because the particular claimants and the administrative agency

1. This opinion borrows heavily from the careful opinion submitted by Commissioner Mastin G. White to the court, though we reach certain major conclusions different from his.

2. The claims set out in the first amended petition aggregated $5,615,450.90, but adjustments were made in the claims at the time of the trial.

3. This is the name commonly used to designate the provisions of law contained in (1) Title VIII of the National Housing Act, as amended and reenacted by Section 401 of the Housing Amendments of 1955 (69 Stat. 635, 646–651) and as further amended by Sections 501–506(a) of the Housing Act of 1956 (70 Stat. 1091, 1109–1110); (2) Sections 403–409 of the Housing Amendments of 1955 (69 Stat. at pp. 651–654), as amended by Sections 506(b)–509 and 511–512 of the Housing Act of 1956 (70 Stat. at pp. 1110–1112); and (3) Section 410 of the Housing Amendments of 1955, as added by Section 510 of the Housing Act of 1956 (70 Stat. at p. 1110).

could not agree on the amounts due the claimants. This suit therefore involves only the residue of the claims.

## I

An unusual feature of the case is that the financial interests of the plaintiff, a joint venture consisting of eight individuals operating under the name of G. L. Christian and Associates, were not affected in any way by the termination of the Fort Polk housing contract. In order to explain this anomalous situation, the events that transpired in connection with the making of the contract will be summarized in some detail.

Pursuant to an invitation for bids issued by the District Engineer in charge of the Galveston District of the Corps of Engineers, the plaintiff, on November 16, 1956, submitted a bid on the construction of the Fort Polk housing project under the Capehart Act. The plaintiff's bid consisted of a basic bid plus certain added items. The District Engineer determined that the plaintiff was qualified by experience and financial responsibility to construct housing under the Capehart Act, and that its bid was the lowest acceptable bid submitted in response to the invitation. The plaintiff's bid was thereupon accepted by the District Engineer in his capacity as contracting officer for the Government. The acceptance was in the form of a "letter of acceptability" dated December 17, 1956.

After its bid for the construction of the Fort Polk housing project was accepted, the plaintiff approached the H. B. Zachry Company in about January 1957 and endeavored to interest that company in forming a joint venture with the plaintiff to construct the project. Zachry was not interested in forming a joint venture with the plaintiff, and so informed it. However, Zachry did indicate a possible interest in obtaining an assignment of the Fort Polk housing project from the plaintiff and handling the job in its entirety. After further discussion, the plaintiff granted Zachry an option to acquire the plaintiff's entire interest in the Fort Polk project for $250,000.

Following these negotiations between the plaintiff and Zachry, the latter approached the Centex Construction Company, Inc., in about February 1957, and proposed that Centex enter into a joint venture with Zachry for the construction of the Fort Polk project. Both Zachry and Centex, which were highly competent construction companies with extensive experience in large-scale enterprises, made estimates regarding the prospective cost of constructing the project and the probable margin of profit in the job, under the price fixed in the plaintiff's bid and in the letter of acceptability. Upon the basis of these calculations, Zachry and Centex concluded that the project was feasible and potentially profitable. Consequently, they decided to take over the Fort Polk housing job from the plaintiff and construct the project as a joint venture.

In furtherance of the decision made by Zachry and Centex, Zachry exercised its option to acquire the Fort Polk project from the plaintiff for $250,000. A document on this matter was signed by Zachry and the plaintiff on March 14, 1957. This document provided that the consideration of $250,000 was to be paid by Zachry to the plaintiff as follows: $100,000 was to be paid "in cash upon approval by the proper governmental agencies of this assignment," an additional $75,000 was to be paid within 9 months, and the final installment of $75,000 was to be paid within 18 months. The document declared that, on the basis of such consideration, "Assignors [the plaintiff] hereby assign, transfer, set over and deliver unto H. B. Zachry Company all of their respective rights, titles and interest held or claimed by Assignors or either of them in and to" the Fort Polk housing job.

A written agreement for the construction of the Fort Polk housing project as a joint venture was entered into by Zachry and Centex on April 9, 1957. This agreement provided (among other things) that Centex would be the managing member of the joint venture and would be in charge of the construction

of the project; that such funds as might be required by the joint venture for construction would be advanced in the proportions of one-third by Zachry and two-thirds by Centex; and that the profits (or losses) resulting from construction would be shared by the joint venturers in the proportions of one-third to Zachry and two thirds to Centex.[4]

Information regarding the existence of the agreements between the plaintiff and Zachry and between Zachry and Centex was furnished to the District Engineer by the attorney for Centex-Zachry at a conference in Galveston. The District Engineer orally expressed approval of the plan for the takeover of the Fort Polk housing job by Centex-Zachry from the plaintiff. It was agreed at the conference that the takeover would be accomplished by means of a formal assignment of the Fort Polk housing contract (when made) from the plaintiff to Centex-Zachry. Subsequently, however, higher authority in the Department of the Army took the position that a housing contract under the Capehart Act could not be assigned.[5] Thereupon, another conference was held in Galveston between the attorney for Centex-Zachry and the District Engineer. At this conference, it was agreed (subject to the approval of higher authority in the Department of the Army) that the transfer of the Fort Polk housing job to Centex-Zachry would be accomplished by means of a subcontract from the plaintiff to Centex-Zachry that would cover the entire job.

After the approval of higher authority in the Department of the Army was obtained with respect to the plan for the transfer of the Fort Polk housing work from the plaintiff to Centex-Zachry by means of a subcontract covering the entire project, a document entitled "Agreement to Sub-Contract with Irrevocable Power of Attorney Attached" was entered into between the plaintiff and Centex-Zachry on June 27, 1957. The agreement stated that the plaintiff relinquished "all its right, title and interest in and to the proposed contract" for the construction of the Fort Polk housing project; that Centex-Zachry "hereby assumes all of the rights and obligations of G. L. Christian and Associates under the Letter of Acceptability * * * and the proposed contract, and further agrees to relieve and save harmless the said G. L. Christian and Associates from its obligations and responsibilities set forth in said Letter of Acceptability * * * and in the proposed contract"; and that Centex-Zachry "hereby covenant and agree to at all times save harmless and keep indemnified the said G. L. Christian & Associates * * * against any and all claims, suits, actions, debts, damages, costs, charges and expenses, * * * and against all liability, losses and damages of every nature whatsoever which G. L. Christian & Associates * * * shall or may at any time sustain or be put to by reason of the aforementioned letter of acceptability, * * * the proposed housing contract * * *, the Power of Attorney * * * made a part hereof, and by the execution of this agreement."

The power of attorney attached to and made a part of this "Agreement to Sub-Contract" irrevocably constituted and appointed Centex-Zachry as the plaintiff's "true and lawful attorney * * * to do any and every act and execute any and every power that Principal * * * might or could do or exercise" in connection with the construction of the Fort Polk housing project, including the authority "to make application for and receive all sums of money due or to become due." The instrument further stated that the plaintiff "hereby represents and agrees that said attorney in fact shall own and be entitled to all moneys and funds payable * * * under said Housing Contract, granting to

---

4. This joint venture will usually be referred to as "Centex-Zachry."

5. This apparently was based upon the first paragraph of Section 3737 of the Revised Statutes, as amended (41 U.S.C. 15).

said attorney in fact authority to collect said funds and to endorse all checks, bills or instruments in connection therewith."

The plaintiff made a profit of $171,516.68 in disposing of the Fort Polk housing job to Centex-Zachry for $250,000, and did not have anything further to do with that project. When a formal contract to cover the construction of the Fort Polk housing project was prepared and signed on July 29, 1957, the plaintiff's name was used as one of the parties to the contract, but the contract was signed on behalf of the plaintiff by Centex-Zachry. Thereafter, Centex (acting for Centex-Zachry) assumed the role of de facto prime contractor, negotiated with the persons interested in furnishing supplies, materials, or services in connection with the performance of the work under the contract, entered into numerous subcontracts, and began the construction of the project. None of these activities involved any expense to the plaintiff, and no claim is asserted against the Government in the present litigation on account of any losses allegedly sustained by the plaintiff in the form of unreimbursed expenses or anticipated profits.

The losses on which the present litigation is based were allegedly sustained by Centex-Zachry, the plaintiff's nominal subcontractor, and by certain of Centex-Zachry's subcontractors. These claimants are maintaining the present action in the name of the plaintiff, the nominal prime contractor, because they, having no privity of contract with the Government, cannot sue the Government in their own names. Severin v. United States, 99 Ct.Cl. 435, 442 (1943), cert. denied, 322 U.S. 733, 64 S.Ct. 1045, 88 L. Ed. 1567 (1944).

■ Generally, when a prime contractor's action against the Government is based on losses allegedly sustained by subcontractors, the possibility of recovery depends not only upon proof that the subcontractors actually sustained the alleged losses, but also upon proof that the prime contractor is liable to the subcontractors for the damages sustained by the latter. Continental Illinois National Bank & Trust Co. v. United States, 101 F.Supp. 755, 758, 121 Ct.Cl. 203, 244–245 (1952), cert. denied, 343 U.S. 963, 72 S.Ct. 1057, 96 L.Ed. 1361; J. L. Simmons Company, Inc. v. United States, Ct.Cl., decided July 18, 1962, 304 F.2d 886, 888–889. In the present case, the plaintiff is not under any liability to its nominal subcontractor, Centex-Zachry, or to the latter's subcontractors because of any losses which these claimants sustained when the Fort Polk housing contract was terminated by the Government. The plaintiff is insulated from such liability by the provision in the "Agreement to Sub-Contract" dated June 27, 1957, to the effect that Centex-Zachry will "at all times save harmless and keep indemnified the said G. L. Christian & Associates * * * against any and all claims, suits, actions, debts, damages, costs, charges and expenses, * * * and against all liability, losses and damages of every nature whatsoever" arising in connection with the Fort Polk housing contract.

■ However, the Government, though mentioning the point, has not stressed the "Severin doctrine", and we do not believe that it applies in these circumstances. With the Government's full knowledge and assent, Centex-Zachry became in actual fact the prime contractor; it signed the contract with the Government on behalf of the plaintiff and took over the entire role of prime contractor, including the management of performance in the six months prior to the cancellation; the defendant has settled with it a large part of the claims and has paid its subcontractors through it. For the purposes of the "Severin doctrine", the only fair position in this court is to treat Centex-Zachry as the prime contractor, to which the housing contract has been assigned with the defendant's full consent, and to disregard the nominal plaintiff as if it were no longer involved.

The question remains whether the Anti-Assignment Act absolutely precludes us from recognizing Centex-Zachry as

the true party in interest. That statute (R.S. § 3737, 41 U.S.C. § 15) speaks imperatively of annulling any Government contract which is transferred, but it has nevertheless been interpreted as being solely for the Government's own benefit and therefore as permitting the Government to assent to and recognize an assignment where it seems appropriate. Maffia v. United States, 163 F.Supp. 859, 862, 143 Ct.Cl. 198, 203 (1958); Thompson v. Commissioner, 205 F.2d 73, 78 (C.A.3, 1953); Federal Mfg. and Printing Co. v. United States, 41 Ct.Cl. 318, 321 (1906); 16 Op.Atty.Gen. 277 (1879); 15 Op.Atty.Gen. 235, 245–246 (1877); 5 Op.Atty.Gen. 738 (1821); but cf. 19 Op. Atty.Gen. 186 (1888). That was certainly done here. Before and during performance of the contract and after its termination, the Government recognized Centex-Zachry as the prime contractor and consented to its full participation in that capacity. It would be unreasonable for us to hold otherwise at this late stage.

## II

The Government concedes that the claimants are entitled to be made financially whole, at least with respect to all reasonable expenses that they incurred in preparing to perform work under the Fort Polk housing contract, in partially performing that contract from August 1957 to January 1958, and in meeting the situation that arose when the contract was formally terminated by the Government early in February 1958. The controversy revolves around the proper amounts of the claimants' unreimbursed expenses and the legal question whether the claimants are entitled to recover for anticipated profits. At the time work was suspended in January 1958, the project was only 2.036% complete and the work was substantially behind schedule.[6]

■ The principal legal question is whether the claimants should be permitted to recover for anticipated profits. In this connection, it is settled that,

when the Government enters into a contract, it has rights and it ordinarily incurs responsibilities similar to those of a private person who is a party to a contract (Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); Perry v. United States, 294 U.S. 330, 352, 55 S.Ct. 432, 79 L. Ed. 912 (1935)), and if the Government terminates a contract without justification, such termination is a breach of the contract and the Government becomes liable for all the damages resulting from the wrongful act (United States v. Behan, 110 U.S. 338, 346, 4 S.Ct. 81, 28 L. Ed. 168 (1884); United States v. Spearin, 248 U.S. 132, 138, 39 S.Ct. 59, 63 L. Ed. 166 (1918)). The damages will include not only the injured party's expenditures and losses in partially performing the contract, but also, if properly proved, the profits that such party would have realized if he had been permitted to complete the contract. Broadbent Portable Laundry Corp. v. United States, 56 Ct.Cl. 128, 132 (1921); see United States v. Behan, supra, 110 U.S. at p. 344, 4 S.Ct. at p. 83. The objective is to put the injured party in as good a position pecuniarily as he would have been in if the contract had been completely performed. Miller v. Robertson, 266 U.S. 243, 257, 45 S.Ct. 73, 69 L.Ed. 265 (1924); Needles for Use and Benefit of Needles v. United States, 101 Ct. Cl. 535, 619 (1944).

■■ The right to recover for anticipated profits arises, however, only if the termination of the contract by the Government is wrongful and constitutes a breach. If the Government has reserved the right to terminate a contract for its convenience and then does so, there is no breach and normally there can be no recovery for the profits that would have been made if the Government had not exercised its reserved right. Davis Sewing Machine Co. of Delaware v. United States, 60 Ct.Cl. 201, 217 (1925), affirmed 273 U.S. 324, 47 S.Ct. 352, 71 L.Ed. 662 (1927); College Point

---

6. The project was supposed to be completed in about 18 months after its commencement in August 1957. The total contract price was $32,893,100.

Boat Corp. v. United States, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925); De Laval Steam Turbine Co. v. United States, 284 U.S. 61, 73, 52 S.Ct. 78, 76 L.Ed. 168 (1931).

█ In the present case, although the Fort Polk housing contract did not contain any provision expressly authorizing the Government to terminate the contract for its convenience, the Government contends that the contract should be read as if it did contain such a clause. This argument is largely based upon Section 8.703 of the Armed Services Procurement Regulations.[7] Section 8.703 provided (with an exception which is not pertinent here) that "the following standard clause shall be inserted in all fixed-price construction contracts amounting to more than $1,000," and then proceeded to prescribe a detailed termination clause that began with the unequivocal declaration that "the performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interest of the Government," and included a formula which did not encompass anticipated profits. As the Armed Services Procurement Regulations were issued under statutory authority,[8] those regulations, including Section 8.703, had the force and effect of law. See Williams v. Commissioner of Internal Revenue, 44 F.2d 467, 468 (C.A.8, 1930); Ex parte

Sackett, 74 F.2d 922–923 (C.A.9, 1935). If they applied here, there was a legal requirement that the plaintiff's contract contain the standard termination clause and the contract must be read as if it did. College Point Boat Corp. v. United States, supra; De Laval Steam Turbine Co. v. United States, supra; Monolith Portland Midwest Co. v. R. F. C., 178 F.2d 854, 858 (C.A.9, 1949), cert. denied, 339 U.S. 932, 70 S.Ct. 668, 94 L.Ed. 1352 (1950).

The question of whether the regulations did govern the present contract depends upon Section 1.102 which limited their applicability to "purchases and contracts made by the Department of Defense * * * for the procurement of supplies or services *which obligate appropriated funds* * * *" (emphasis added). Plaintiff contends that the Fort Polk housing contract did not "obligate appropriated funds." It points out that the construction of housing projects at military installations under the Capehart Act was financed by means of loans from private lending institutions, and the contractors and subcontractors doing the construction work were paid out of the proceeds of such loans. In this case, the money for the construction of the Fort Polk housing project was loaned by the Republic National Bank of Dallas, and the progress payments to Centex-Zachry and its subcontractors during the partial construction of the project were derived from the loans made by the Republic National Bank of Dallas.[9]

7. At the time with which we are concerned, the Armed Services Procurement Regulations comprised Subchapter A of Chapter I of Title 32, CFR (Rev. 1954).

8. The Armed Services Procurement Act of 1947, 62 Stat. 21, 41 U.S.C. § 151 et seq. (1952 ed.) [See 10 U.S.C.A. § 2301 et seq.], was the principal statute relied upon in issuing the regulations.

9. The steps in a Capehart Act project are as follows: After deciding that a housing project should be built at or in connection with a post on government-owned property, the Army (for example) would have preliminary plans prepared, secure a preliminary approval from F.H.A., and then issue an invitation for bids. A "letter

of acceptability" would be issued to the lowest acceptable bidder (see findings 3, 13), requiring it, *inter alia*, to organize one or more mortgagor-builders which would lease the underlying land from the Government and make arrangements with a financial institution to finance the project with a 100% mortgage. As construction proceeds, the mortgagor-builders draw money from the bank and pay the contractor. When the project is completed, the contractor will have received his full bid price and the mortgagor-builders will own the project, subject to a 100% mortgage to the financial institution which is the mortgagee. The stock of the mortgagor-builders, previously placed in escrow, will then be transferred

On the other hand, the Government insists that it was anticipated that the cost of constructing the Fort Polk housing project would ultimately be liquidated out of appropriated funds, because it was expected that the housing project would be completed, that the dwelling units would be occupied by military personnel assigned to Fort Polk, and that the quarters allowances of such military personnel (provided for in the annual appropriations to the Department of the Army) would be used to pay off, over a period of years, the loans made by the Republic National Bank of Dallas. Also, the loans made by the bank for the construction of the Fort Polk housing project were insured by the Federal Housing Administration, and from the beginning there was at least a possibility that the F.H.A. might be compelled to make good on its commitments to the bank. As indicated in footnote 9, supra, on completion of the project or on termination of the contract, the Government specifically undertook (in the contract with plaintiff and accompanying agreements) to take over ownership of the mortgagor-corporations, to assume liability to the mortgagee for sums advanced, and pay the outstanding notes. Moreover, Centex-Zachry and its subcontractors have looked to the Government for settlement and payment of their claims, and have received very large amounts of appropriated funds in the partial settlements which have already been accomplished.

 Despite the unusual character of the contract, we have little difficulty in reading the Procurement Regulations, especially the rule requiring the insertion of the standard termination clause, as applying to the present type of agreement which could and would obligate appropriated funds, ultimately if not immediately. As we see it, the primary aim of the exclusion of agreements which do not obligate appropriated funds

is to put to one side the contracts of the conventional nonappropriated-fund instrumentalities of the armed forces, such as post exchanges, ships' stores, officers' clubs, and the like. The contracts of such agencies, although made by Government officers, do not bind appropriated funds, do not create a debt of the United States, and may not be vindicated in this court. Borden v. United States, 116 F.Supp. 873, 126 Ct.Cl. 902 (1953); Pulaski Cab Co. v. United States, 157 F.Supp. 955, 141 Ct.Cl. 160 (1958); cf. Standard Oil Co. of California v. Johnson, 316 U.S. 481, 485, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942). Those are the contracts which the Procurement Regulations declare are to be governed by their own separate rules. But the Regulations do not intimate that contracts which obligate the United States, and create a debt of the United States upon which suit is and can be brought, are also excluded simply because the use or obligation of appropriated funds is delayed and to some extent contingent. There is no doubt that the contract in this case bound the United States and that appropriated funds are importantly involved. The contractor and subcontractors did not hesitate to consider the United States, which of course pays through appropriated funds, liable for the cancellation of the contract. Large sums of appropriated monies were accepted after administrative settlement, and suit is now brought in a court whose judgments are payable through appropriated funds. It would be extraordinary, we think, if an agreement for the breach of which the United States must pay through appropriations was not deemed to obligate such funds.

The Congressional authorization for the contract, i. e., the Capehart Act itself, recognizes affirmatively that appropriated funds will be involved. One section authorized "to be appropriated such sums as may be necessary to provide for

---

to the Army. Thereafter, moneys appropriated to pay the housing allowances of personnel assigned quarters in the project buildings are used to service the

mortgage. The Government, as owner of the mortgagor-builders, is liable for the outstanding indebtedness and maintains and operates the housing.

payment to meet losses from such guaranty" given by the Defense Department to the Armed Services Housing Mortgage Insurance Fund (12 U.S.C. § 1748b(b) (2) (1958 ed.)). Another provision permits the military departments to use "[a]ppropriations for quarters allowances or appropriate allotments" for the payment of principal, interest, and other obligations of mortgagor corporations acquired by the Government (42 U.S.C. § 1594b (1958 ed.)) (see footnote 9, supra). The Congress which passed the Capehart Act understood that in the long run the housing contracts thereunder could and would "obligate appropriated funds."

We are not, and should not be, slow to find the standard termination article incorporated, as a matter of law, into plaintiff's contract if the Regulations can fairly be read as permitting that interpretation. The termination clause limits profit to work actually done, and prohibits the recovery of anticipated but unearned profits.· That limitation is a deeply ingrained strand of public procurement policy. Regularly since World War I, it has been a major government principle, in times of stress or increased military procurement, to provide for the cancellation of defense contracts when they are no longer needed, as well as for the reimbursement of costs actually incurred before cancellation, plus a reasonable profit on that work—but not to allow anticipated profits. In World War I, there was the Act of June 15, 1917, 40 Stat. 182, and the Dent Act of 1919, 40 Stat. 1272, both of which were held to prevent awards of prospective or possible profits. Russell Motor Car Co. v. United States, 261 U.S. 514, 523–524, 43 S.Ct. 428, 67 L.Ed. 778 (1923); Barrett Co. v. United States, 273 U.S. 227, 235, 47 S.Ct. 409, 71 L.Ed. 621 (1927); De Laval Steam Turbine Co. v. United States, 284 U.S. 61, 73, 52 S.Ct. 78, 76 L.Ed. 168 (1931). In World War II, the termination provisions used by the war contracting agencies (at least since late 1941) uniformly disallowed anticipated profits. See the opinion of Mr. Justice Douglas in United States v. Penn Foundry & Mfg. Co., 337 U.S. 198, 214–216, 69 S.Ct. 1009, 93 L.Ed. 1308 (1949), also 337 U.S. at 205–206, 69 S.Ct. at 1012–1013; Office of Contract Settlement, A History of War Contract Termination and Settlements (July 1947), pp. 1, 27. The same policy against unearned profits was embodied in the Contract Settlement Act (Act of July 1, 1944, 58 Stat. 649), Section 6(d) (5) of which directed war contracting agencies, in settling terminated contracts, to award "such allowance for profit on the preparations made and work done for terminated portion of the war contract as is reasonable under the circumstances"; the regulation issued by the Office of Contract Settlement specifically limited profit to preparations made and work done (32 C.F.R., 1944 Supp., Sec. 8006.3(c), p. 3065). Similarly, the Lucas Act of August 7, 1946, 60 Stat. 902, authorizing the departments and agencies "to consider, adjust, and settle equitable claims of contractors," limited the amount of the claim to "losses (not including diminution of anticipated profits) incurred * * *." Since World War II, the standard termination clauses promulgated by the Defense Department and its constituent agencies have taken the same tack. Literally thousands of defense contracts and subcontracts have been settled on that basis in the past decades.

This history shows, in our view, that the Defense Department and the Congress would be loath to sanction a large contract which did not provide for power to terminate and at the same time proscribe anticipated profits if termination did occur. Particularly in the field of military housing, tied as it is to changes and uncertainties in installations,[10] would it be necessary to take account of a possible termination in advance of completion, and to guard against a common law measure of recovery which had been disallowed for so many years in

10. See Henry Barracks Housing Corp. v. United States, Ct.Cl., decided July 15, 1960, 281 F.2d 196, 201–202.

military procurement. The experienced contractor in this case, for its part, could not have been wholly unaware that there might be a termination for the convenience of the Government, which the defendant would not deem a breach. Although the housing contract does not contain such an express provision, there are at least four references in it (and the accompanying agreements) to a "termination of the Housing Contract for the convenience of the Government" and to the Government's assumption of certain obligations in that event. These references must have had some meaning. For many years unearned profits have not been paid upon such terminations, and we think it probable, too, that Centex-Zachry knew of that general policy.

For all of these reasons, we believe that it is both fitting and legally sound to read the termination article required by the Procurement Regulations as necessarily applicable to the present contract and therefore as incorporated into it by operation of law.

It follows that Centex-Zachry and its subcontractors cannot recover unearned but anticipated profits. Under the standard termination clause (see finding 31(b)), which we hold governs this case, the contractor is entitled to the cost of the work performed and the cost of settling subcontract claims—plus 2% of the cost of materials and articles delivered to the site but not incorporated in the work and 8% of the balance of the cost (with the total profit not to exceed 6% of the whole cost of the work), unless the contractor would have sustained a loss on the entire contract in which event no profit is to be allowed. This is the guide for ascertaining Centex-Zachry's profit. Profit for the subcontractors should be allowed on the same basis.

Since the parties did not apply the termination article in their administrative settlements and the case was not tried in this court on that principle, it may be impossible or overly difficult at this stage to comply precisely with all the terms of the article or fully to accord with the general practice which has grown up under it. But we believe the article should be applied as nearly as it can reasonably be to the determination of allowable profit and with greater leeway, if necessary, to the other problems which may arise. We leave to the Commissioner, under Rule 38(c), the actual determination of the amounts still owing (if any), under these standards, to Centex-Zachry and the subcontractors for earned profit. For the guidance of the parties and the Commissioner, we add simply that we are not impressed with the defendant's faint suggestion that Centex-Zachry would have suffered a loss on the entire contract and that some of the subcontractors would have been in the same position.

### III

There are a few items of cost, actually incurred, as to which the parties still disagree. With respect to Centex-Zachry, the Government disputes the allowance of the full $250,000 payment made by Centex-Zachry to the plaintiff, pointing out that $171,517 of that amount represents profit to the plaintiff and only $78,483 represents the costs of performance by plaintiff before it assigned the contract (see finding 46). The Commissioner took account of this $171,517 profit by allowing it as a cost to Centex-Zachry but deducting it in computing the latter's contemplated profit. In view of our disallowance of anticipated profits, we believe it preferable to include only the sum of $78,483, reflecting an actual cost to performance, in the contractor's costs. The defendant also attacks the allowance of $58,484 in legal fees, but we see no reason to disturb the Commissioner's finding that this was a reasonable allowance. We have also examined the few exceptions to the findings relating to the costs of the subcontractors of Centex-Zachry, but have not been persuaded that the Commissioner was wrong.

On costs (leaving aside profit under the termination clause) the result is that

we find that Centex-Zachry has received $34,630 more than its incurred costs; and that, of the subcontractors, Air-Way Corporation is entitled to $1,270 for unreimbursed costs, Kitzman's joint venture is entitled to $13,512.72 but owes the defendant $65,915.83 for plumbing materials, Mid West Contracting Company is entitled to $2,500, and Witte Gravel Company has been paid for all its costs.

Plaintiff is entitled to recover, on behalf of Centex-Zachry and the subcontractors, in accordance with and to the extent indicated in this opinion. The amount of the recovery, if any, on behalf of Centex-Zachry and the subcontractors will be determined pursuant to Rule 38(c).

JONES, Chief Judge, and DURFEE, LARAMORE and WHITAKER, Judges, concur.