NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1450

TOTAL PROCUREMENT SERVICE, INC.,

Appellant,

v.

Robert M. Gates, SECRETARY OF DEFENSE,

Appellee.

Donnie Dac Ho, South Coast Law Center, of Santa Ana, California, for appellant.

Courtney E. Sheehan, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for respondent. With her on the brief were Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was JoAnn W. Melesky, Defense Information Systems Agency/Defense Information Technology Contracting Organization, United States Department of Defense, of Scott Air Force Base, Illinois.

Appealed from: Armed Services Board of Contract Appeals

Administrative Judge Robert T. Peacock

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1450

TOTAL PROCUREMENT SERVICE, INC.,

Appellant,

v.

Robert M. Gates, SECRETARY OF DEFENSE,

Appellee.

Appeal from the Armed Services Board of Contract Appeals in nos. 54163 and 55821, before Administrative Judge Robert T. Peacock.

_____

DECIDED:  July 17, 2009

_____

Before MICHEL, <u>Chief Judge</u>, NEWMAN, and DYK, <u>Circuit Judges</u>.

PER CURIAM.

This case concerns damages for a breach of contract by the United States.  Total Procurement Services, Inc. ("TPS") was a party to the contract.  TPS argues that, due to the government's contractual breach, it suffered damages of $69,855,022.  The Armed Services Board of Contract Appeals ("Board") upheld the denial of the claim, ruling that TPS had not proven damages resulting from the breach.  Because the Board's decision was supported by substantial evidence, we <u>affirm</u>.

# I.    BACKGROUND

We write mainly for the parties and therefore provide only a brief summary of the facts, which are sufficiently set forth in the Board's opinion.  See In re Total Procurement Servs., Inc., ASBCA Nos. 54163 and 55821, 08-1 BCA ¶ 33,843 (Mar. 24, 2008) ("Board Decision").  In July 1993, the Department of Defense ("DoD") commenced a study which recommended ways to use electronic commerce to improve its acquisition process.  An ultimate recommendation from the study was the creation of a DoD infrastructure utilizing a multiple value-added network ("VAN") approach.  VANs were to provide the distribution of electronic transactions to customers based internationally.  As contemplated, the government would create an infrastructure comprising DoD distribution points, or hubs, that would make covered DoD procurement actions accessible only to VANs that executed the standardized VAN licensing agreement ("VLA").

TPS was incorporated in July 1992.  During 1993 and 1994 and prior to the VLA, TPS's business involved providing procurement information to its customers in paper format, entitled Sales Opportunity Reports ("SORs").  TPS created the SORs from procurement data reformatted into a more "user friendly" format for TPS's clients.  If a TPS client was interested in a particular solicitation, the client submitted its bid (or quotation or proposal) directly to the government.  TPS did not send customer information back to the government.  TPS's business grew to about 100 customers and continued through the year 2000.

Sometime prior to 1995, TPS decided to become certified as a VAN under the DoD's plan.  In early 1995, TPS determined that it could pass the necessary testing

2008-1450

requirements pursuant to the VLA. In July 1995, the VLA signed by TPS became effective when it was executed by the contracting officer. The VLA was structured as a "no cost" to the government contract. Accordingly, VAN providers would earn revenues from fees charged to vendors or trading partners. TPS expected that VANs operating pursuant to the VLA would be the mandatory conduits for DoD electronic procurement transactions and that TPS's customer base would dramatically increase.

The implementation of the program did not proceed as originally expected. Traffic through the infrastructure declined in 1996 as the use of internet websites, electronic bulletin boards, and other alternative means increased. The complexity of the system also impeded a satisfactory implementation by the government. In January 1999, the government notified TPS that the government was exercising its right under Article 2 of the VLA to terminate the license agreement. The termination became effective February 15, 1999.

TPS seeks to recover compensation based on two categories of damages based on the government's breach before the termination. First, TPS claims anticipatory profits resulting from the alleged loss of customers and potential customers. Second, TPS asks for recovery of software programming costs allegedly incurred by TPS in its effort to comply with the requirements of the VLA. The Board found that TPS had not met its burden of proving its claim for either type of damages. For the reasons set forth below, we affirm the Board's decision.

## II.    DISCUSSION

This appeal involves only factual issues, and "[a]s to questions of fact, if substantial evidence supports the Board's factual findings, this court will uphold them

2008-1450

absent some indication that the decision is 'fraudulent, arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith.'" Grumman Aerospace Corp. v. Wynne, 497 F.3d 1350, 1356 (Fed. Cir. 2007) (quoting 41 U.S.C. § 609 (2006)); see also Fruin-Colnon Corp. v. United States, 912 F.2d 1426, 1428-29 (Fed. Cir. 1990).

With respect to TPS's first category of alleged damages, "[a] claim for an attenuated loss resulting from a breach, like a lost profits claim, must not be speculative and must be supported by evidence providing a reasonable basis for the amount of damages." Fifth Federal Lincoln Bank v. United States, 518 F.3d 1308, 1319 (Fed. Cir. 2008). TPS does not challenge the legal standard relied upon by the Board, but mainly challenges the factual findings upon which the Board concluded that TPS had not met its evidentiary burden.

As the Board explained, "the VLA was a 'no cost' license involving an untried, high risk venture in an unstable, rapidly evolving market without minimum guarantees." Board Decision at 167,496. Relying in part on its previous decisions in In re CACI International, Inc., ASBCA Nos. 53058 and 54110, 05-1 BCA ¶ 32,948 (Apr. 29, 2005), aff'd 177 F. App'x 83 (Fed. Cir. 2006), and In re Simplix, ASBCA No. 52570, 06-1 BCA ¶ 33,240 (Mar. 14, 2006), aff'd sub nom. Imagination & Information, Inc. v. Gates, 216 F. App'x 990 (Fed. Cir. 2007), the Board concluded that "TPS has failed to establish the requisite causal link between the government's breach and the claimed lost profits or prove that they were a reasonably foreseeable consequence of the breach given the nature of the VLA and attendant circumstances." Board Decision at 167,497. On appeal before us, TPS has not sufficiently explained why the Board's decision with

2008-1450

-4-

respect to causation and foreseeability was lacking substantial evidentiary support or otherwise erroneous.

Furthermore, the Board found that TPS's evidence of lost clients did not meet the "reasonable certainty" requirement. Of particular note is the Board's finding that "TPS deleted, destroyed or failed to properly maintain virtually all documentation and records that might have provided some evidence of damages experienced." The Board also found that, despite TPS's claim of losing 1,474 clients, the evidence did not show that TPS either had or lost that many clients during the relevant time period, or that "any VAN customer terminated any agreement with TPS as a result of the breach." Moreover, the Board found that "no billing records, subscription forms, invoices to customers or other corroborating documentation were produced" to support TPS's allegation that it lost VAN customers.

On appeal, TPS does little more than quarrel with the Board's factual findings. For instance, TPS argues that "[n]o evidence was ever submitted by either side that a client list ever existed," which, in TPS's view, undermines the Board's reliance on its finding that TPS failed to offer any client list to the Board. We understand TPS's position to be that it never had a physical, written client list. That may be, but if so, what TPS misunderstands is the Board's need for client information that could have substantiated TPS's claim of 1,474 lost clients. Moreover, in the very next sentence in its brief, TPS cites testimony of its own witness, who stated that "[t]he client list is in the computer and is in the database that covers clients." Thus, as the Board found, TPS at one time possessed the identities of its alleged clients. Before the Board, however, TPS offered little to no evidence as to which companies, entities, or persons were

affected TPS clients during the relevant time period. According to the Board's finding, all TPS offered to support its claim of 1,474 lost customers was a crude calculation based on assumptions and a "client number":

> TPS determined that it lost a total of 1,474 clients. It derived this number by obtaining the last client "number" (2574) allegedly assigned by its computer system to new clients over the period 1992 to 2003. It then subtracted the beginning number of 1000 to determine that TPS's services had been used by a total of 1,574 clients during that time. Finally, it subtracted the number of clients that still used TPS's services of "approximately 100" as of 2003 to derive the number of clients of 1,474 that were allegedly lost as a result of the government's breach.

Board Decision at 167,492. As sufficiently explained by the Board, such a calculation does not in this case rise to the level of "reasonable certainty" as to either accuracy or causation. TPS's other disagreements with the Board's lost profits findings and analysis are equally without merit.

As to TPS's claim for software development costs, the Board's factual findings are likewise supported by substantial evidence. TPS sought approximately $120,000 which it purportedly paid to its employees for writing computer programs relating to the VLA. The Board found that the sole documentary evidence relied upon by TPS—namely, employee W-2 forms for the tax years 1994 through 1996—was unsegregated, questionable, and uncorroborated. TPS submitted "[n]o canceled checks, accounting or bank records or other documentation [to] support or verify that the amounts claimed were incurred" on the VLA project. TPS also claimed $36,000 paid to contract programmers, but the Board similarly found this claim to be unsupported. The Board noted that TPS submitted no documentation demonstrating that the contract programmers were in fact paid. The only programmer who testified stated he was paid

2008-1450

"at best a few thousand," and TPS admitted that it did not prepare or file the pertinent forms with the IRS covering the alleged payments to the contract programmers. The Board also concluded that TPS made no effort to explain how the purported programming costs were necessary for, reasonable, and allocable to the VLA, as opposed to TPS's other commercial work or other governmental work unrelated to the VLA. On appeal, TPS fails to demonstrate that the Board's findings are unsupported by substantial evidence.

Accordingly, we affirm the Board's decision.

2008-1450