# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Atlas Sahil Construction Company ) ASBCA No. 58951
)
Under Contract No. W919QA-10-C-0073 )

APPEARANCE FOR THE APPELLANT: Thomas Rosenstock, Esq.
Domenic Senger-Schenck, Esq.
Rosenstock Legal Services
Kabul, Afghanistan

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
Army Chief Trial Attorney
MAJ Raymond R. Adams, JA
MAJ James P. Leary, JA
Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE YOUNGER

In this appeal under a construction contract to expand a military base in Afghanistan, appellant Atlas Sahil Construction Company (Atlas Sahil or appellant) seeks recovery on its claim for convenience termination settlement costs. Atlas Sahil contends that it furnished sufficient evidence of its costs to substantiate its claim, and the Army argues that the claim lacks the supporting documentation to support the amounts claimed. Both entitlement and quantum are before us for decision. We sustain the appeal in part.

## FINDINGS OF FACT

1. By date of 27 September 2010, the Army awarded Contract No. W919QA-10-C-0073 (the contract) to Atlas Sahil for the expansion of Forward Operating Base Deh Dadi II (Deh Dadi) in Mazar-e-Sharif, Afghanistan (R4, tab 10). The base served as a "logistical hub to support [United States] draw down efforts in Afghanistan" (tr. 1/16).

2. The contract was a design-build, firm-fixed-price construction contract in the amount of AFN 491,315,463.92 (equivalent to $9,962,112.80 at an exchange rate of 49.3184 AFN/USD) (R4, tab 10 at 2). Under the contract, appellant was to provide all material, labor, equipment, and supervision to: (1) construct and install various structures, including nine large 90 x 120 foot tents, referred to as "Maintenance Tents"; (2) provide and install power distribution systems and generator sets; and (3) provide earthwork and materials for the expansion of Deh Dadi (R4, tabs 2-6, 10 at

3-9; tr. 1/16). The use for the tents was to perform general maintenance or other necessary work on vehicles, or to store them (tr. 2/44-45). Each tent was wired for electricity and a heating/cooling system (HVAC), and had a door large enough to permit ingress and egress of vehicles (tr. 2/44).

3. The contract contained various standard clauses, including: FAR 52.242-14, SUSPENSION OF WORK (APR 1984); DFARS 252.222-7002, COMPLIANCE WITH LOCAL LABOR LAWS (OVERSEAS) (JUN 1997); DFARS 252.233-7001, CHOICE OF LAW (OVERSEAS) (JUN 1997); CENTCOM Contracting Command Clause, 952.225-0015, SUBCONTRACTING REQUIREMENTS (JUL 2010); and CENTCOM Contracting Command Clause, 952.228-0001, WORKERS COMPENSATION INSURANCE (DEFENSE BASE ACT) (JUL 2010) (R4, tab 10 at 30, 34). The contract also contained FAR 52.249-2, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (MAY 2004) – ALTERNATE I (SEPT 1996) which provided in subparagraph (i) that "[t]he cost principles and procedures of Part 31 of the [FAR],...shall govern all costs claimed, agreed to, or determined under this clause."

4. The contract also contained a Statement of Work. It provided in part that the project site is "believed to be clear of UXOs [unexploded ordinance], but it is not guaranteed" (R4, tab 2 at 5).

5. In describing the project work, the parties followed the convention of dividing it using contract line item numbers (CLINs). As originally awarded, the contract contained 28 CLINs (R4, tab 10 at 3-16 of 41).

6. By date of 10 October 2010, Atlas Sahil entered into a joint venture partnership agreement with Sambros International Corporation (Sambros), another Afghan company, to purchase the tents and generators supplied under the contract, provide financing, and complete performance of the Deh Dadi contract (supp. R4, tab 70; tr. 1/31-32, 98).

7. The record contains a copy of Invoice No. 136 dated 26 February 2011 from Al Baddad International (Al Baddad) in Dubai to Sambros for nine tents and component equipment, such as steel rollup doors and single doors. According to the invoice, the total sale price to Sambros for the nine tents and component equipment, including delivery, was $747,000. (R4, tab 19 at 1-2) From the uncontroverted testimony of the contracting officer, we find that he contacted Al Baddad, the manufacturer of the tents, and obtained a copy of the invoice; the $747,000 price differed from the $1,647,000 price for the tents on the Al Baddad invoice "provided to me with the [settlement] proposal"; and the two invoices contained differences in font, as well as the transposition of numbers on the post office box address shown, and the bank account details for Al Baddad. (Tr. 2/105-07)

8. The government issued a suspension of work notice to Atlas Sahil dated 10 April 2011, effective the next day (R4, tab 11). While the notice contained the

2

usual language instructing Atlas Sahil to cease all work, make no further shipments, and place no further orders, the contracting officer did instruct the company that it could "take delivery of, and deliver the generators" (*id.*). In a 9 April 2011 email to appellant's project engineer that also accompanied the suspension notice, the contracting officer underscored that "[y]our company is not to incur any cost past the date of the notice" (R4, tab 13 at 2). In addition, in an 11 April 2011 email the contracting officer advised appellant's CEO that "during this time of suspension, there will be no allowance for any cost for this contract." (App. supp. R4, tab 30 at 3-4) Nonetheless, appellant continued to retain a full complement of employees on staff at the Deh Dadi site after the notice of suspension (tr. 1/98-99).

9. By date of 12 April 2011, appellant provided the government with its claimed costs to date, but stated that, "we are not going to terminate the contracts with our Deployed employees" and requested advice regarding generators and tents (app. supp. R4, tab 30 at 2-3). The contracting officer responded by advising appellant:

> If you choose to continue [incurring] cost during [the] suspension, the cost will not be covered by the contract. This is the purpose of the Suspension, not to incur unnecessary cost.
>
> ....
>
> A notice to proceed has not been issued. A brief review of your cost spent to-date are expenses that should not have been incurred. [The site must be demined over the next 60-90 days.] During this time, there should be little to no incurred expenses for the contract.

(*Id.* at 1-2)

10. By memorandum to appellant dated 24 April 2011, the contracting officer advised appellant that it was "authorized to commence with the fabrication/ordering and delivery of the required tents for the subject contract" and that, "[w]ith the exception of the agreed upon order and delivery of the generators [*see* finding 8], all remaining work remains suspended until properly notified by the responsible Contracting Officer" (R4, tab 12).

11. By email to appellant dated 5 May 2011, the contracting officer advised that, "[w]ith the suspension of work, [appellant] should not be performing any work.... After the [pending] submittals are reviewed and returned the only work being performed should be the generators and tents." (App. supp. R4, tab 34 at 1)

3

12. By email to appellant dated 18 October 2011, the contracting officer advised appellant that the contract would be modified so that "you are going to be installing ONLY 4 of the 90 x 120 maintenance tents. The other 5 tents will be turned over to the Government complete with interior electrical and HVAC equipment." (App. supp. R4, tab 44 at 13-14)

13. By date of 9 December 2011, the contracting officer issued Modification No. P00001 "to descope the contract" and add specified work. First, by the modification, the footprint of the project was reduced from the original 60-plus acres to 44 acres. Second, the contracting officer reduced the requirement in CLINs 0001-0004 and directed appellant to install four maintenance tents, instead of nine such tents. Third, by the modification, under CLINs 0005 through 0009, appellant was required only to deliver the remaining five tent structures to the government; installation was no longer required. Fourth, the number of power generation zones was reduced from ten to three. Fifth, the contracting officer added a new CLIN 0029 for "costs for site assessment of 44 acres, benchmark, and storage" in the net amount of $129,120. Finally, the government substantially reduced the contract price by the modification and extended the completion date to 22 April 2012. (R4, tab 14 at 1-2, 4 of 19; tr. 1/160-63, 2/68)

14. By date of 16 December 2011, the contracting officer issued Modification No. P00002 extending the project's completion date from 22 April 2012 to 13 June 2012 (app. supp. R4, tab 88 at 1).

15. By notice to proceed dated 16 December 2011, the contracting officer directed appellant to proceed on the project within five days and to complete the project within the contractually-required period of 180 calendar days. Appellant acknowledged receipt of the notice by date of 17 December 2011. (R4, tab 10 at 20 of 41; app. supp. R4, tab 83)

16. By date of 13 March 2012, the contracting officer issued a notice of termination for convenience "in accordance with FAR clause 52.249-2 Alt I" (R4, tab 17 at 1). The notice required appellant to maintain all records showing the "[e]xtent of completion of performance on the effective date [of termination]" (id. at 2). Atlas Sahil acknowledged receipt of the notice the next day (id. at 4). The contracting officer testified, and we find, that the contract was terminated because Deh Dadi was going to be closing and there was no longer a need to expand it (tr. 2/69).

17. In April 2012, consistent with the contracting officer's direction in the termination letter (R4, tab 17 at 2), appellant delivered nine maintenance tents to Deh Dadi from its facility in Mazar-e-Sharif (tr. 2/49). We find that the tents were damaged. The protective coating on the majority of the steel parts delivered was abraded, paint was peeling off of some parts, which indicated that the protective coating was not properly applied, and that multiple parts exhibited dents and missing tabs. (R4, tab 20 at

4

1; *see generally* supp. R4, tab 75 at 2-29 (photographs)). We further find that appellant neither delivered, nor installed, any of the electrical components for the tents, including the HVAC systems (*see* finding 2). In his 23 May 2012 Preliminary Price Negotiation Memorandum, the contracting officer recited that the contracting officer's representative estimated that "it will [require] the expenditure of $284,825 to bring all tents to a usable state" (app. supp. R4, tab 88 at 3).

18. Following the termination for convenience, appellant submitted a settlement proposal seeking a termination settlement of $3,680,186.90 (R4, tab 18 at 6). This proposal was not on Standard Form 1435, and was accompanied by numerous invoices (*id.*). Thereafter, by date of 27 February 2013, appellant submitted a settlement proposal in the amount of $3,976,780.78 (R4, tab 26 at 4). By date of 16 November 2012, the contracting officer rendered his determination, concluding that "no settlement amount can be reached" (R4, tab 25 at 1). He noted that appellant had not submitted a certificate of cost and pricing data, as required by FAR 15.403-4(a)(1)(iii) and 15.406-2 (*id.*). The contracting officer determined that, upon submission of a valid certificate of cost and pricing data, the government might agree to pay a total of $1,063,318.04 out of a total of $3,844,841 proposed by appellant (*id.* at 2-3).

19. Subsequent negotiations failed and, by certified claim dated 27 February 2013, appellant sought $4,158,840.70 as the amount due as a termination settlement under the contract (R4, tab 26). The claim amount comprised total costs of $3,976,780.78 and settlement expenses of $182,059.92 (*id.* at 3). We find that the government received the claim on 27 February 2013.

20. To place appellant's claim in context, we note that the government approved appellant's design of the project at the 60 percent completion level, but never approved appellant's 95 percent design submittal, which was the threshold for design implementation (tr. 1/40, 115-16, 148).

21. Appellant never broke ground at the construction site (tr. 1/110).

22. Appellant's chief executive officer testified that, during contract performance, appellant had possession of its cost records, but thereafter, Sambros took custody of all such records (tr. 1/89-90, 101-02). For labor costs, for example, the documents included QuickBooks and Excel spreadsheets reflecting the names of each employee and the salary disbursements by date (tr. 1/100). Appellant asserts without evidentiary support that because of a dispute between it and Sambros, the latter has denied appellant access to its cost records (Appellant's Post-Hearing Brief (app. br. at 16)). Appellant's chief executive officer did not testify regarding the nature or duration of the dispute, or why it motivated Sambros to deny appellant access to its records. No witness from Sambros testified. Appellant's chief executive officer also testified that

appellant's cost records were originally compiled by its project engineer, whose exact whereabouts in Afghanistan were unknown at the time of trial (tr. 2/195-96).

23. We find that there were material discrepancies in numerous documents that appellant did produce that caused the contracting officer to question their reliability or authenticity. Frequently, the contracting officer found what appeared to be an invoice or paid receipt, but it appeared on appellant's letterhead, together with a representation that payment had been made, without evidence that another party had received payment. In addition, he found that, after checking with the Afghan government, appellant's license to do business in Afghanistan had been altered. (Tr. 2/104-05)

24. With its original settlement proposal, appellant included two receipts from Yang Ming (UAE) LLC (Yang Ming) in Dubai, each of which reflects a separate payment of $162,000 to Yang Ming for the shipment of different "Cntrs nos.," followed by a total of 19 sets of numbers on both receipts (R4, tab 19 at 79-82). While neither of the Yang Ming documents reflect the name of Al Baddad, the government appears to accept, and we find, that the invoices represent a reliable and fair determination of the cost for delivery of the tents from Dubai to appellant's leased warehouse in Mazar-e-Sharif, near Camp Marmal, with the abbreviation "Cntrs" referring to containers and corresponding to numbers appearing on packing lists for containers elsewhere in the record (tr. 2/124-27). In addition, there is no dispute that $12,244.00 represents the reasonable cost to transport the tent structures from appellant's leased warehouse to the government (R4, tab 19 at 77).

25. There is no dispute that appellant incurred a cost for specified design, site assessment, and warehouse work (see finding 13; gov't br. at 51).

26. In evaluating appellant's settlement proposal, the contracting officer questioned the claimed labor costs. From examination of the available documentation, he found that the amount of work that appellant performed on the contract did not support the number of employees for whom appellant claimed expenses. Among the items that the contracting officer questioned were: the office staff employed at its office and warehouse in Mazar-e-Sharif, near the project site, which office included multiple employees whom the contracting officer regarded as surplus, given the amount of contract work. In addition, the contracting officer determined, and we find, that appellant claimed the cost of its entire workforce for the entire term of the project, including the eight-month suspension period from 10 April 2011 to 16 December 2011 (see findings 8, 15). Appellant incurred these costs for the entire term although the contracting officer told appellant in the suspension notice itself, and in two subsequent emails, that it should not incur costs during the suspension period (finding 8). Appellant refused to lay off any of its workforce during the suspension period, stating that "we are not going to terminate the contracts with our Deployed employees" (finding 9). The contracting officer also compared appellant's initial proposal

6

regarding salaries with its settlement proposal and determined that "salaries were two and sometimes three times higher in the settlement proposal as opposed to what [appellant] had originally proposed under the contract" (tr. 2/113). Thus, the salary for appellant's project manager was originally proposed as $2,000 per month (R4, tab 7 at 18), but appeared in the settlement proposal as $6,000 per month (R4, tab 19 at 98). After analyzing appellant's labor costs for his preliminary price negotiation memorandum, the contracting officer concluded that the following mix of employees for the following durations and at the following salaries represented a reasonable level of staffing at a reasonable cost:

| Description | Person/Mo. | Months | Unit Cost | Total |
|---|---|---|---|---|
| Project Manager | 1 | 3 | $ 2,000 | $ 6,000 |
| Architectural Designer | 1 | 2 | $ 800 | $ 1,600 |
| Structural Designer | 1 | 2 | $ 500 | $ 1,000 |
| Mechanical Designer | 1 | 2 | $ 560 | $ 1,120 |
| Electrical Designer | 1 | 2 | $ 2,500 | $ 5000 |
| Civil Designer | 1 | 3 | $ 2,600 | $ 7,800 |
| Data Manager | 1 | 2 | $ 1,500 | $ 3,000 |
| Planning Engineer | 1 | 3 | $ 1,500 | $ 4,500 |
| Guard | 2 | 1 | $ 190 | $ 190 |
| Driver | 1 | 1 | $ 250 | $ 25 |
| Admin Officer | 1 | 3 | $ 850 | $ 2,550 |
| Finance Officer | 1 | 3 | $ 900 | $ 2,700 |
| | | | Total | $ 35,710 |

From the above analysis, the contracting officer concluded that a reasonable amount for appellant's labor costs was $35,710 (app. supp. R4, tab 88 at 5). In its brief, the government revised that amount upward to add the $4,560 cost of four security guards at appellant's warehouse in Mazar-e-Sharif (gov't br. at 53). The sum of these two cost figures is $40,270. We find that this total represents appellant's reasonable labor cost because it incorporates the cost of four security guards at appellant's warehouse while the parts for the maintenance tents were stored there.

27. Appellant charged the cost of its CEO at an annual salary of $300,000 and stated that he spent "approximately 28 per cent of time during the project period spent on this project" (app. 3rd supp. R4, tab 26(b) at 12 n.10). In testimony, however, the

CEO estimated that, during performance, he participated in "around ten" meetings with government officials and travelled to the project three times (tr. 1/131).

28. In its settlement proposal, appellant sought costs for its office at Mazar-e-Sharif of $172,500 (app. 2nd supp. R4, tab 88 at 6; tr. 2/167). We find this cost unreasonable inasmuch as it includes rent for periods in which there was no construction activity on site (*e.g.*, tr. 2/167-68). The government has proposed $12,000 as equitable because it compensates appellant for the four-month period from issuance of the notice to proceed in December 2011 and delivery of the maintenance tents in April 2012 (findings 15, 17; *see* gov't br. at 53).

29. Appellant claims severance costs of $49,525 for its employees (app. 3rd supp. R4, tab 26(b) at 14). While the appellant's legal entitlement to severance costs is disputed, appellant's computation of the cost is not.

## DECISION

### A. Christian Doctrine

Appellant's entitlement to termination costs is determined by those applicable portions of the FAR that are incorporated into the contract. *Rex Systems, Inc.*, ASBCA No. 59624, 16-1 BCA ¶ 36,350 at 177,216. The termination clause included here is FAR 52.249-2, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (MAY 2004) – ALTERNATE I (SEPT 1996) (finding 3).

Appellant first argues that it is unreasonable to rely solely upon the construction termination clause found in the contract (*see* finding 3) because performance entailed both supply and service elements (app. br. at 13-14[1]). Accordingly, Atlas Sahil asserts that "[t]he standard termination clause," by which it means FAR 52.249-2, "should be read into the Contract" under the *Christian* doctrine (*id.* at 14). *See G.L. Christian & Associates v. United States*, 312 F.2d 418 (Ct. Cl. 1963).

We reject this argument. In *Christian*, the court analyzed the Armed Services Procurement Regulations (ASPR) and concluded that they required the insertion of the standard termination clause in the type of contract at issue in the case. The court therefore read the prescribed termination clause "as necessarily applicable to the...contract and therefore as incorporated into it by operation of law." *Christian*, 312 F.2d at 427. In *General Engineering & Machine Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993), the court of appeals explained that, "under the Christian Doctrine [the board] may insert a clause into a government contract by operation of law if that clause is required under

---

[1] Page numbers to appellant's brief have been added by the Board.

applicable federal administrative regulations. However, the Christian Doctrine does not permit the automatic incorporation of every required contract clause."

In the contract before us, the parties agreed to Alternate I to the FAR 52.249-2 Termination clause (finding 3). The notice of termination was issued under that clause (finding 16). Atlas Sahil has not pointed to any regulation requiring the inclusion of FAR 52.249-2, in lieu of FAR 52.249-2 Alternate I, in this circumstance. We know of no such regulation. We accordingly reject Atlas Sahil's argument.

### B. Standard for Award

Appellant's argument regarding the measure of its recovery is based upon two propositions. First, appellant argues, "[t]he CLIN pricing of the Contract provides the most reliable method for determining fair compensation" (app. br. at 22). Appellant urges that "the parties have already reached negotiated agreement on the fair value for much of the work that is the subject of the termination for convenience" (*id.*). Second, appellant contends that, "where CLIN-based pricing is not applicable or practical," then we can resort to the contracting officer's preliminary price negotiation memorandum as the basis for a jury verdict award (*id.* at 23-24). Using this two-pronged approach of CLIN-based pricing plus jury verdict, appellant contends that it is entitled to the award that it seeks (*id.* at 1, 23-24).

For its part, the government maintains that appellant is entitled to an award of a fraction of this amount, relying upon the case law that a contractor "bears the burden of proving by a preponderance of the evidence that it is entitled to a greater termination settlement amount than that determined by" the terminating contracting officer. *General Dynamics Land Systems, Inc.*, ASBCA No. 52283, 02-1 BCA ¶ 31,659 at 156,411. The government also stresses that a contractor "bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of [its] loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987). From these premises, the government concludes that appellant's award should be no more than $1,396,721.96 (gov't br. at 48).

We reject appellant's proposed standard for an award. First, we reject appellant's argument that CLIN pricing "provides the most reliable method for determining fair compensation" (app. br. at 22), and that in departing from this method, the government "has repudiated its commitment to pay agreed upon prices" (*id.* at 1). CLIN prices are based on price, whereas termination settlements are based on cost, *viz.*, the cost of "the work done and the preparations made for the terminated portions of the contract." FAR 49.201(a), Additional Principles for Fixed-Price Contracts Terminated for Convenience (Jul 2010). CLIN prices are established for fully completed components of

contract performance, not for terminated components. They do not reflect what transpired after contract award, or after issuance of a modification.

Second, we reject appellant's request for a jury verdict award. Appellant tells us that a jury verdict is warranted because it has a justifiable inability to present documentation of its costs. Appellant asserts that:

> Those accounting records which do exist are in the possession of Sambros [*see* finding 6]..., who was [appellant's] prime supplier and source of financing for the project. As a result of conflict between the two companies arising directly out of the Government's failure to pay [appellant] even a single penny under the Contract, Sambros has denied [appellant] access to those records.

(App. br. at 16) (Citations omitted) Appellant also argues that the government's past practice of addressing cost issues through "reasonable negotiation," rather than cost audits led to an expectancy that "the Government would continue to act in accordance with the FAR principles" (*id.*).

We conclude that resort to a jury verdict is unwarranted on this record. In *International Equipment Services, Inc.*, ASBCA Nos. 21104, 23170, 83-2 BCA ¶ 16,675 at 82,924-25, *aff'd on recon.*, 84-1 BCA ¶ 17,025, we stressed that a jury verdict was only available where the contractor "has demonstrated a justifiable inability to substantiate the amount of its injury by direct and specific proof." *See Grumman Aerospace Corp. v. Wynne*, 487 F.3d 1350, 1358 (Fed. Cir. 2007) (enumerating criteria and upholding the Board's refusal to employ the jury verdict method where the record did not warrant an approximation of damages).

Appellant's generalized claims about a "conflict" between it and Sambros leading to Sambros' denying appellant access to its records (app. br. at 16) do not constitute "a justifiable inability to substantiate the amount of its injury by direct and specified proof." *Grumman Aerospace*, 487 F.3d at 1358. As we have found, no one from Sambros testified regarding the alleged dispute between it and appellant, the location of the records, or their present condition (finding 22). In addition, appellant's project engineer, who is said to have compiled the cost records in the first instance, also did not testify (*id.*). Moreover, appellant disregards FAR 31.201-2(d), which provides in part that "[a] contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles." As we held in *Total Procurement Service Inc.*, ASBCA Nos. 54163, 55821, 08-1 BCA ¶ 33,843 at 167,499, *aff'd*, 337 F. App'x, 906 (Fed. Cir. 2009), "[t]he failure to

10

maintain, preserve and promptly produce to the government fundamental accounting data and records goes to the credibility of the entire claim."

We regard the evidence in the existing record as sufficient to reach a decision, without the need to resort to a jury verdict. The contracting officer did review the available cost data and, in some instances, obtain his own information, which is useful. Thus, the largest item is the tent costs, and that can be established precisely from the Al Baddad invoice (*see* finding 7), without resort to a jury verdict. We evaluate the evidence in the record in light of appellant's burden to prove that it is entitled to a greater termination settlement amount than determined by the contracting officer. *See General Dynamics Land Systems*, 02-1 BCA ¶ 31,659 at 156,411.

### C. Specific Cost Categories

As indicated, appellant seeks total costs of $3,507,828.31, together with settlement costs of $182,059.92, for a total of $4,158,840.78 in this appeal (R4, tab 26). For its part, the government urges that the fair and reasonable amount owed to appellant is no more than $1,498,277.62 (gov't reply at 1, 14). Our decision regarding the cost categories that are disputed in the parties' submissions in their briefs are as follows.

#### 1. Tent Costs

Appellant seeks to recover $1,647,000 for nine maintenance tents, based upon the CLIN prices in Modification No. P00001. By contrast, the government contends that the fair price for the nine tents is $747,000, based upon the Al Baddad invoice (*see* finding 7). This figure gives appellant the benefit of the $284,825 estimated cost to bring all tents to a usable state (*see* finding 17).

We reject appellant's proposed price for the tents. We cannot reconcile appellant's reliance on CLIN prices because we regard the Al Baddad invoice as reliable. By Modification No. P00001, appellant was relieved of the requirement for the complete installation of the tents, which was reflected in the CLIN prices, and was required merely to deliver some of them (finding 13).

We accordingly allow $747,000 for the cost of the tents.

#### 2. Shipment and Delivery Costs for Tents

We conclude that appellant is entitled to recover $336,244 for shipment and delivery of the maintenance tents. This amount is substantiated by documentary evidence and represents the sum of: (a) $324,000 ($162,000 x 2) for shipment from Dubai to Camp Marmal; and (b) $12,244 for shipment from Camp Marmal to Deh Dadi (finding 24).

### 3. *CLIN 0029 Costs*

It is undisputed that appellant performed the work called for by CLIN 0029 for the specified design, site assessment, and warehouse work (*see* finding 13). We accordingly allow $129,120 for CLIN 0029.

### 4. *Labor Costs*

Appellant proposed labor costs of $331,520 (app. reply at 8). The government, by contrast, insists that only $40,270 is consistent with the test of reasonableness in FAR 31.201-2 and 31.201-3 (gov't br. at 52-53).

We conclude that the amount claimed by appellant is unreasonable. As indicated, appellant never received full design submittal approval, and never broke ground on this construction project (findings 20-21). In addition, appellant's proposal includes the cost of appellant's entire workforce for the entire term of the project, ignoring the eight-month suspension period from 10 April 2011 to 16 December 2011 (*see* findings 8, 15). The contracting officer told appellant in the suspension notice itself, and in two subsequent emails that it should not incur costs during the suspension period (finding 8), and yet it simply refused to lay off or discharge its workforce, stating that "we are not going to terminate the contracts with our Deployed employees" (finding 9). Although, it is conceivable that there may be instances in which paying employees during a pause in work is reasonable, *see Pro-Built Construction Firm*, ASBCA No. 59278, 17-1 BCA ¶ 36,774, appellant has not produced any evidence here supporting such a finding. Thus, it is unreasonable that the government, and not appellant, should bear the cost of this conduct during this period.

In the face of appellant's high labor costs, we credit the contracting officer's analysis of labor cost in his preliminary price negotiation memorandum (finding 26). He determined that a reasonable amount for labor costs was $35,710 (*id.*), which amount the government has revised upward to add the $4,560 cost of four security guards at appellant's warehouse in Mazar-e-Sharif (*id.*). The sum of these two cost figures is $40,270 which we allow as the reasonable labor cost.

### 5. *Office Space Costs*

We have already found that the government's $12,000 figure for office space costs is reasonable, and that appellant's proposed cost of $172,500 is unreasonable because it covers periods in which there was no construction activity at the site (finding 28). We accordingly allow $12,000 as the reasonable cost for office space.

12

## 6. *DBA Insurance Costs*

The parties agree on the claimed cost of DBA insurance in the incurred amount of $28,663.00 (R4, tab 25 at 2), and we allow the cost as claimed.

## 7. *Termination Settlement Costs*

Appellant contends that it is entitled to recover "both its post-termination administrative costs as well as its severance payments to employees" (app. reply at 9). The claimed administrative costs aggregate $55,416.60 (app. 3rd supp. R4, tab 26(b) at 14). The claimed severance payments aggregate $49,525.00 (*id.*). Appellant also claims estimated legal costs of $40,000.00 (*id.*).

For its part, the government asserts that the administrative costs "are merely alleged costs with absolutely no substantiation in the record." The government also argues that it has no responsibility to compensate appellant for the claimed severance costs. (Gov't reply at 12)

A. We allow the administrative costs claimed. Appellant claims the costs of four employees who are listed as having worked on resolving the termination settlement (app. br. at 59). The claimed costs have plausibility. Appellant has itemized their time by employee, the respective hours worked, and the hourly rates of each (app. 3rd supp. R4, tab 26(b) at 14). One listed employee is appellant's CEO and another is the project manager who compiled appellant's cost records (*see* finding 22). We allow the $55,416.60 claimed.

B. We also allow the claimed severance costs. The contract incorporated by reference DFARS 252.222-7002 (*see* finding 3), which required appellant to comply with all "[l]ocal laws" and [l]abor regulations including fringe benefits." In turn, the relevant cost principle under the contract's Termination clause (*see* finding 3), makes termination costs subject to the cost principles of FAR Part 31 (*id.*). FAR 31.205-6(g)(2) provides that:

> Severance pay is allowable only to the extent that, it is required by –
> (i)     Law;
> (ii)     Employer-employee agreement;
> (iii)     Established policy that constitutes, in effect, an implied agreement on the contractor's part; or
> (iv)     Circumstances of the particular employment.

In its brief, appellant contends that "[s]everance is required under Afghan law, and is customary to be expected when a contract is terminated" (app. br. at 60). The government, by contrast, argues that "appellant does not assert [that] it was legally

13

obligated to pay these costs, and it has not presented any evidence of Afghan customs" (gov't br. at 54).

Appellant relies upon the English translation of the Afghan Labor Code (2007). Article 3, [Definitions of] Expressions, provides in section 1 that the Code applies to "private or mixed businesses." In turn, Article 23, Termination of the Contract, defines the situations in which "[a]n employment contract may be abrogated," thereby triggering an obligation to make severance payments. The two situations are set forth in Article 23(6), "[c]essation of work for more than six months" and Article 23(7), "reductions in the number of staff of an [employer]." In either situation, Article 25(2) provides that the employer "shall be obliged to make a payment, of the last [w]age of the respective rank or grade to the Employees whose contracts have been terminated." Article 25(2) further provides for differing amounts based on length of service. Afghan Labor Law at http://www.slideshare.net/afghanboy1/afghan-labor-law-aisa-version.

We agree with appellant that severance payments are required by Afghan law and hence are allowable. There is no challenge to the reasonableness or allocability of the claimed amount of $49,525.00. We accordingly allow $49,525.00.

C. The parties do not seriously dispute appellant's entitlement to legal costs. The government tells us that appellant is owed the costs "pursuant to the provided records. However, the amounts are incorrect. According to the provided numbers, the legal fees are $40,782 and $40,792.00." (Gov't br. at 53) We award the higher amount of $40,792.00.

## 8. *Profit Rate*

Appellant proposed a profit that works out to 25.3 percent of the claim (R4, tab 25 at 3). The contracting officer proposed an amount that equals a flat ten percent profit rate (*id.*). In its reply brief, however, the government strongly argues for a five percent rate.

FAR 49.202(a) allows for profit "on preparations made and work done by the contractor for the terminated portion of the contract but not on the settlement expenses." In addition, FAR 49.202(b)(1) provides that, in determining profit, relevant factors include the "[e]xtent and difficulty of the work done by the contractor as compared with the total work required by the contract."

Considering the guidance of FAR 49.202, we agree with the government that a five percent profit rate (excluding settlement expenses) is warranted. As we have found, while this was a construction contract, appellant never broke ground on the project (finding 21). Before the project was descoped in Modification No. P00001, appellant was to have installed nine tents, but this effort was reduced to installation of four tents,

14

and delivery of the remaining five, and then reduced simply to delivery of four tents (finding 13). Given the sharply reduced effort called for, as well as the accompanying risk, a five percent profit rate on all but settlement expenses is reasonable.

## SUMMARY

We conclude that appellant is entitled to recover the following amounts in the following cost categories:

| | | |
|---|---|---|
| 1. Tent Costs | | $747,000.00 |
| 2. Shipment and Delivery of Tents | | $336,244.00 |
| 3. CLIN 0029 Costs | | $129,120.00 |
| 4. Labor Costs | | $ 40,270.00 |
| 5. Office Space Costs | | $ 12,000.00 |
| 6. DBA Insurance Costs | | $ 28,663.00 |
| Subtotal | | $ 1,293,297.00 |
| 7. Termination Settlement Costs | | |
| a. Administrative Costs | $55,416.60 | |
| b. Severance Costs | $49,525.00 | |
| c. Legal Fees | $40,792.00 | |
| Subtotal | $145,733.60 | |
| 8. Subtotal | | $1,439,030.60 |
| 9. Profit (5% of $1,293,297.00[2]) | | $64,664.85 |
| TOTAL: | | $1,503,695.45 |

Appellant is entitled to interest under the 41 U.S.C. § 7109(b) from 27 February 2013 (*see* finding 19) until paid.

---

[2] Termination settlement costs excluded.

## CONCLUSION

The appeal is sustained to the extent indicated. In all other respects, it is denied.

Dated: 9 November 2017

ALEXANDER YOUNGER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58951, Appeal of Atlas Sahil Construction Company, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

16